UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MAUREEN COOPER**,                              Case No. 1:11 CV 2109

            Plaintiff,                    Magistrate Judge James R. Knepp II

    v.                                     MEMORANDUM OPINION AND
                                                ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

            Defendant.

### INTRODUCTION

Plaintiff Maureen Cooper seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

On February 8, 2008, Plaintiff filed an application for DIB stating she was disabled due to chronic obstructive pulmonary disease (COPD), internal bleeding, diabetes, and hepatitis C and alleging a disability onset date of January 1, 2004. (Tr. 126, 145). Her claim was denied initially (Tr. 106) and on reconsideration (Tr. 111). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 114). At the ALJ hearing, Plaintiff amended her alleged onset date to October 8, 2007. (Tr. 34–35). Born June 23, 1955, Plaintiff was 55 years old when the hearing was held on July 14, 2010. (Tr. 27, 126). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 21, 27). In her Brief on the

Merits, Plaintiff only challenges the ALJ's conclusions on her physical impairments (*see* Doc. 14), and therefore waives any claims about the determinations regarding mental impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Therefore, the undersigned addresses only pertinent physical health records.

Medical Evidence Between Alleged Onset Date and Date Last Insured[1]

On October 8, 2007, Plaintiff presented to the emergency room (ER) complaining of right lower leg pain, fever, chills, migraines, nausea, and vomiting. (Tr. 229). Plaintiff stated she smoked four cigarettes a day and drank three beers a week. (Tr. 229). Notes mentioned Plaintiff's hepatitis C, diabetes, migraines, and COPD. (Tr. 229–30). Plaintiff's lungs were clear but with decreased breath sounds. (Tr. 230). Her right lower extremity was erythematous and edematous, and she was diagnosed with cellulitis of the right lower extremity and diabetes mellitus. (Tr. 230). An endoscopy performed on October 12, 2007 showed severe erosive gastritis and test results also showed anemia. (Tr. 232, 234).

Plaintiff was hospitalized from January 15 to January 17, 2008 after going to the ER complaining of shortness of breath, chest pain, and coughing. (Tr. 256). She was diagnosed with COPD exacerbation and improved significantly after treatment with nebulizers and steroids. (Tr. 256). Plaintiff had a full range of motion in her extremities, normal motor strength, intact sensation, a normal back exam, and a normal musculoskeletal exam. (Tr. 258, 263, 265). She received a blood transfusion due to iron deficiency. (Tr. 259). Despite having reported quitting several days earlier, hospital records noted Plaintiff frequently went outside to smoke "without any complaints

---

1. The ALJ determined Plaintiff's date last insured was March 31, 2009. (Tr. 15).

2

whatsoever". (Tr. 256, 258). Additionally, Plaintiff's toxicology screens were positive for marijuana and cocaine despite her denial of illicit drug abuse. (Tr. 256, 258). The doctor recommended Narcotics Anonymous but Plaintiff did not show any significant interest. (Tr. 256). At discharge, she had no difficulty ambulating or shortness of breath. (Tr. 256).

Plaintiff was also hospitalized with COPD exacerbation from January 29 to February 4, 2008. (Tr. 238). She complained of shortness of breath, chest pain, and coughing. (Tr. 239). Her gait was steady and she had a full range of motion. (Tr. 251). Plaintiff claimed she stopped smoking three days earlier, used alcohol occasionally, and had not used cocaine since her last admission. (Tr. 239). Plaintiff's examination was largely normal. (Tr. 240). A chest x-ray showed no acute disease and a CT scan of her chest was negative for pulmonary embolism. (Tr. 240). Notes indicated Plaintiff also had diabetes, hepatitis C, chronic iron deficiency anemia, and a history of blood in her stools. (Tr. 238). The day after she was admitted, notes indicated Plaintiff suffered from bilateral pneumonia and stated Plaintiff smoked, drank alcohol, and used cocaine. (Tr. 243). While in the hospital, Plaintiff underwent a consultation for anemia and she reported she continued to smoke cigarettes and drink six to twelve beers per week. (Tr. 241). She refused a colonoscopy, was cleared for discharge from a pulmonary standpoint, and was told to follow up with her primary care physician. (Tr. 238).

Plaintiff presented to the ER on February 11, 2008 complaining of right-sided chest pain. (Tr. 317–25). Plaintiff said the previous week a hospital told her "she ha[d] a 'blockage' of her heart". (Tr. 320). On examination, Plaintiff's extremities were normal with no tenderness. (Tr. 321). An EKG was normal and chest x-rays showed mild hyperinflation without acute cardiopumlonary process. (Tr. 321, 323). Plaintiff underwent a cardiac stress test on February 12, 2008. (Tr. 313). The

3

results were "indeterminate", but Plaintiff's prognosis was good and there was a low probability of significant ischemic heart disease. (Tr. 315). Plaintiff returned to the hospital on February 18, 2008 for a follow-up visit, at which time her neurological exam was normal, with no weakness, gait problems, numbness, burning pain, tremors, or memory loss. (Tr. 326–27). On March 7, 2008, Plaintiff returned to the ER again complaining of right-sided chest pain. (Tr. 330, 334). An EKG and chest x-ray showed no significant changes from the ones performed in February and it was "unlikely that [her] chest pain [wa]s of cardiac etiology". (Tr. 335, 337).

On April 3, 2008, Plaintiff visited a medical clinic regarding her diabetes, reporting high blood sugar. (Tr. 348). She was educated about diabetes and how to administer insulin. (Tr. 349). Due to Plaintiff's history of anemia and gastrointestinal bleeding, a colonoscopy was performed April 11, 2008. (Tr. 350–51). It revealed small internal hemorrhoids, which were thought to be the source of Plaintiff's bleeding but not the source of her anemia. (Tr. 351–52). Plaintiff could move all her extremities at that time. (Tr. 350). She returned to the clinic on April 16, 2008 to establish a primary care physician. (Tr. 355). Dr. Nora J. Lindheim noted Plaintiff had never treated her hepatitis C and had recently started treating her poorly controlled diabetes with insulin injections. (Tr. 355). Dr. Lindheim also noted Plaintiff was still smoking and had no interest in quitting despite having COPD, and she stated Plaintiff had known gallstones and anemia. (Tr. 355). Dr. Lindheim's notes indicated Plaintiff's diabetes had improved but she still had "suboptimal control." (Tr. 356). Plaintiff was clinically suspicious for cirrhosis, needed a referral to the liver clinic, and was advised not to drink alcohol. (Tr. 356). Dr. Lindheim concluded Plaintiff had many serious medical issues that would take time and effort to address. (Tr. 356).

On April 25, 2008, tests revealed multiple gallstones and fatty infiltration changes of

4

Plaintiff's liver. (Tr. 347). When Plaintiff returned to the clinic on April 30, 2008, she reported she was trying to quit smoking but was not interested in a smoking cessation program. (Tr. 356). Her diabetes was poorly controlled. (Tr. 356). Plaintiff's neurological exam was negative for any symptoms; her gait was normal and she had no numbness, memory loss, sleep disturbance, disorientation, or inattention. (Tr. 358).

An endoscopy performed May 13, 2008 showed mild gastritis, but not enough to explain Plaintiff's anemia. (Tr. 361). On May 19, 2008, she returned to the clinic to follow up on her diabetes and adjust her medication. (Tr. 412). Plaintiff requested medication for migraines and also requested Chantix, stating she wanted to stop smoking. (Tr. 412). At that time, Plaintiff stated she was starting to walk and do sit-ups a few times a week. (Tr. 413). On May 22, 2008, she complained of numbness, weakness, pain, and stiffness in both her hands, which had lasted for one week. (Tr. 415). Examination revealed positive Tinel's sign at her right wrist and positive Phalen's sign bilaterally. (Tr. 416). She was diagnosed with carpal tunnel syndrome, given wrist splints to wear at night, and prescribed a trial of Naprosyn. (Tr. 416). On May 30, 2008, a pulmonary function test suggested lung parenchymal stiffness or muscle weakness. (Tr. 419).

On June 4, 2008, Plaintiff went to the clinic for a follow-up visit, again reporting she was still trying to quit smoking but not interested in a smoking cessation program. (Tr. 421). Her blood sugar was better-controlled. (Tr. 421). She complained of back pain but not radiating pain and asked for narcotics. (Tr. 421). She also reported she was on house arrest. (Tr. 421). On June 6, 2008, Plaintiff's neurological exam was normal, with no weakness, gait problems, numbness, or burning pain. (Tr. 433). Tests showed her liver was slightly increased in echogenicity and heterogenous in echotexture. (Tr. 435). Notes indicated Plaintiff would likely not want to treat her hepatitis C, but

5

there were indications she may have early cirrhosis and Plaintiff was instructed to completely stop using alcohol. (Tr. 435).

On June 10, 2008, Plaintiff complained of right shoulder pain, tenderness, and a soft tissue mass in her right shoulder causing occasional radiating pain. (Tr. 437). She also complained of right upper quadrant pain. (Tr. 440). Plaintiff was instructed to follow up in a few weeks for her right upper quadrant pain and to discuss options for removing the shoulder mass. (Tr. 440). The same day, spine x-rays revealed mild deformity of the anterior-superior end plate of L4 – which notes indicated could reflect remote injury – but no acute abnormality was identified. (Tr. 402). On June 17, 2008, an endoscopy showed normal results. (Tr. 442).

On July 24, 2008, Plaintiff presented with lower back pain and stated over the counter medications did not help her pain; she preferred Percocet. (Tr. 489). She wanted to find out how to help her back pain and to find someone to refill her Percocet. (Tr. 489). Treatment notes indicated very poorly controlled diabetes, COPD, and migraines. (Tr. 489). Plaintiff had a normal gait and could walk on her heels and toes. (Tr. 489). She also had a normal motor exam, intact sensation, and normal reflexes. (Tr. 489). The doctor told Plaintiff there were "not great surgical treatments" for lower back pain, as the results of such procedures are unpredictable. (Tr. 490). Additionally, Plaintiff was told patients who smoke and have poorly controlled diabetes have worse results with surgical intervention. (Tr. 490). The doctor did not recommend orthopedic surgical intervention and referred her to the physical medicine and rehabilitation department (PM&R clinic) to help with her pain. (Tr. 490).

On August 11, 2008, Plaintiff went to the ER complaining of gastrointestinal bleeding. (Tr. 536, 545). She denied any breathing difficulties, cough, or leg pain and had no pain or stiffness in

6

her joints. (Tr. 543–44). Plaintiff admitted drinking alcohol prior to going to the ER. (Tr. 545). She received a blood transfusion. (Tr. 545). While in the hospital, Plaintiff went outside to smoke without permission from staff. (Tr. 545). The cause of her bleeding was thought to be due to arterio-venous malformation or an ulcer. (Tr. 546). She was instructed to stop using Naprosyn and Ibuprofen due to the high risk of gastrointestinal bleeding. (Tr. 556).

On August 20, 2008, Plaintiff went to the PM&R clinic for her chronic lower back pain and was given Percocet. (Tr. 491). She described her pain as a ten out of ten across her lower back, with occasional shooting pains down the back of both legs. (Tr. 491). Plaintiff also reported numbness and tingling in her toes and said lifting, bending, physical activity, weather, and walking worsened her pain but nothing improved it. (Tr. 491). Her range of motion in her back was moderately decreased – worse with extension – and examination revealed tenderness at the lumbrosacral junction and lumbosacral spinal muscles. (Tr. 493). Plaintiff had normal reflexes, normal sensation, normal motor strength, and a normal gait. (Tr. 493). A neurological exam was normal except for positive Tinel's sign on her right upper extremity and Phalen's sign bilaterally. (Tr. 493). She was diagnosed with a history of L4 compression fracture from an old injury, with pain; some radicular symptoms; and questionable carpal tunnel. (Tr. 493). The doctor noted Plaintiff needed an MRI of her back and said she seemed very genuine. (Tr. 494).

On September 4, 2008, Plaintiff attended a follow-up appointment and had two lipomas on her right upper extremity, with one of them thought to be causing tingling in her right hand. (Tr. 495). Plaintiff went to the ER on September 6, 2008 complaining of chronic back pain and was prescribed Percocet. (Tr. 582–86). On September 17, 2008, an MRI of Plaintiff's lumbar spine showed an old-appearing compression deformity of L4 with a Schmorl's node invaginating the

superior end-plate. (Tr. 457). There was also associated disc degeneration at L3-4, with posterior bulging and mild bilateral foraminal impingement, but no frank extrusion or evidence of recent fracture. (Tr. 457).

Plaintiff went to the ER complaining of back pain on September 18, 2008, had a decreased range of motion in her back, and was prescribed Percocet. (Tr. 501–03). She had a full non-tender range of motion in all extremities, a normal motor exam, normal reflexes, and normal sensation. (Tr. 640–41). On October 11, 2008, Plaintiff returned to the ER complaining of chronic back pain radiating to her leg and was discharged with a prescription for Percocet. (Tr. 575, 577, 668). On October 14, 2008, Plaintiff went to the ER yet again complaining of back pain. (Tr. 627). The notes indicated an exacerbation of chronic back pain and an x-ray revealed a deformity of the superior endplate of L4 due to a compression fracture of "indeterminate age". (Tr. 627, 635). Her physical examination was normal except for the back pain and a decreased range of motion in her back, and she had no numbness or weakness, no difficulty walking, a negative straight leg raise test bilaterally, a normal motor exam, normal reflexes, normal sensation, and a full non-tender range of motion in her extremities. (Tr. 629–30).

Plaintiff was hospitalized from December 1 to December 5, 2008 for anemia related to gastrointestinal bleeding. (Tr. 593). When she first arrived at the ER she also complained of nausea, vomiting, dizziness, shortness of breath, and generalized weakness. (Tr. 595). Plaintiff's neurological exam was normal and her extremities were non-tender with full movement. (Tr. 596, 618–19). Notes also indicated she was independent in activities of daily living. (Tr. 619). An EGD revealed mild esophagitis and mild gastritis, with large inflamed hemorrhoids and a possible faint AVM near the hepatic flexure. (Tr. 598). A chest x-ray showed no acute cardiopulmonary disease.

(Tr. 600). An EKG showed normal left ventricular systolic function, mild mitral regurgitation, and mild tricuspid regurgitation. (Tr. 602). Plaintiff received blood transfusions and notes stated she had cirrhosis of the liver secondary to hepatitis C. (Tr. 593).

On January 17, 2009, Plaintiff went to the ER complaining of back pain and reported she strained her back in a near-fall a few days earlier. (Tr. 650–51). Plaintiff told the doctors she took Vicodin for chronic back pain but was currently out of medication. (Tr. 651). Physical examination revealed no evidence of neurologic deficits in the lower extremities and x-rays were negative for acute bony abnormality. (Tr. 651). Plaintiff had a decreased range of motion in her back but normal reflexes, a full non-tender range of motion in her extremities, and no apparent motor or sensory deficit. (Tr. 661). She was discharged with prescriptions for Flexeril and Vicodin and instructed to follow up with her primary care physician. (Tr. 651).

Medical Evidence After Plaintiff's Date Last Insured

Plaintiff first saw Dr. Antony George for her back pain on July 27, 2009, reporting numbness in her hands and feet, tingling in her hands, balance issues and falls, occasional chronic headaches, sleep disturbance, and mental health issues. (Tr. 928). She said her back pain affected her ability to walk, lift, do housework, and think, and also reported stiffness in her legs, arms, and back. (Tr. 930). Dr. George noted some range of motion issues and recommended physical therapy. (Tr. 929). Between August 2009 and June 2010, Plaintiff saw Dr. George numerous times for injections and medication refills, generally reporting back pain, radiating shoulder pain, and difficulty sleeping. (Tr. 804–13, 915–27). At various points, Plaintiff also complained of a ringing in her left ear (Tr. 776), occasional dizziness (Tr. 777, 807), leg pain, neck pain, hip pain, and side pain (Tr. 807, 810, 919–20, 922), hand numbness (Tr. 805–06, 809), and leg numbness (Tr. 805). Dr. George typically

9

noted tenderness, spasms, and range of motion difficulties – particularly in her shoulders (Tr. 805–08, 810–11, 813, 915–16, 918, 921–27), and he sometimes noted weakness (Tr. 927), strength issues (Tr. 926), and left shoulder impingement (Tr. 805).

On August 10, 2009, Plaintiff told Dr. George her pain was worse with humidity and rain. (Tr. 927). X-rays of Plaintiff's shoulders on August 25, 2009 showed normal symmetric appearance with normal joint spaces, no significant osteophyte formation, and no fracture or dislocation. (Tr. 859).

Plaintiff went to the ER on September 2, 2009 complaining of back and hip pain and was diagnosed with a left sciatica exacerbation. (Tr. 768–69). Notes indicated she was independent in activities of daily living, her back was non-tender with a painless range of motion, and she could move all her extremities but had an unsteady gait. (Tr. 771).

On September 30, 2009, an MRI of Plaintiff's left shoulder showed minimal fluid in the subacromial bursa, but was otherwise unremarkable with no sign of a rotator cuff tear. (Tr. 944). An MRI of her right shoulder also showed minimal fluid in the subacromial and subdeltoid bursa, probably relating to minimal supraspinatus tendinosis, but no sign of a rotator cuff tear. (Tr. 945). On October 6, 2009, Dr. George recommended more stretches and an EMG. (Tr. 811). On November 17, 2009, Dr. George noted Plaintiff needed therapy and more injections. (Tr. 810).

Plaintiff went to the ER on December 8, 2009 due to elevated blood sugar and feelings of weakness. (Tr. 835–36). She also reported shoulder pain, back pain, and migraines. (Tr. 837). Examinations of her respiratory system, back, extremities, and neurological system were normal, including no motor or sensory deficit and a full non-tender range of motion in her extremities. (Tr. 841).

10

On December 15, 2009, Plaintiff told Dr. George her last injection worked for about a week and she had only gone to physical therapy once. (Tr. 808). Later that month, Plaintiff complained of pain and told Dr. George she was trying to exercise. (Tr. 807).

On January 19, 2010, neurologist Dr. Norton A. Winer evaluated Plaintiff. (Tr. 936). Plaintiff complained of neck and lower back pain, right hand locking, cramping, and paresthesias in both lower extremities. (Tr. 936). She exhibited diminished pinprick, light touch, and vibratory sensation in a stocking and glove distribution and had a positive Tinel sign over her right carpal tunnel. (Tr. 936). Dr. Winer noted Plaintiff was symptomatic for moderately severe right carpal tunnel syndrome and mild left carpal tunnel syndrome, along with probable polyneuritis secondary to diabetes mellitus and bilateral lumbar radiculitis. (Tr. 936, 938). He noted she could benefit from surgical carpal tunnel release but decided to leave it up to Dr. George to refer her for surgery. (Tr. 936).

On January 26, 2010, Plaintiff told Dr. George her back pain was to the point she could barely move or sit. (Tr. 805). He referred her for an EMG of her cervical spine. (Tr. 805).

On February 6, 2010, Plaintiff's daughter found Plaintiff difficult to rouse, with very low blood sugar, and called the EMS to take Plaintiff to the ER. (Tr. 815). She had no motor, sensory, or reflex deficit, and her extremities were non-tender with a normal range of motion. (Tr. 819). It was thought Plaintiff may have over-medicated due to a relatively new psychiatric medication. (Tr. 815). She requested numerous pain medications and stated she might sign out of the hospital against medical advice if she did not get her requested medication. (Tr. 823). The physical therapy department found Plaintiff's sensation and coordination were within normal limits, as was her range of motion in her right and left lower extremities. (Tr. 826). She had some diminished extremity strength, some limited upper-extremity range of motion, and some gait problems. (Tr. 826–28). A

11

CT scan of her head was negative. (Tr. 834).

On March 8, 2010, Dr. C.J. Manohar noted Plaintiff was supposed to see him right after she was discharged from the hospital in February but was "somehow . . . very busy" and did not come to his office for almost a month. (Tr. 955). She complained of occasional chest pressure. (Tr. 955). At the appointment, she had no chest pain, palpitations, or shortness of breath, a normal respiratory exam, and no neurological deficit. (Tr. 955). Her blood sugar was very high and Dr. Manohar adjusted her medication. (Tr. 955). Dr. Manohar also performed an EKG, which showed normal results. (Tr. 955).

An x-ray performed on March 11, 2010 was a "[n]egative study of the cervical spine" showing some left mandibular calcification. (Tr. 861, 940).

Plaintiff was evaluated for physical therapy on March 11, 2010. (Tr. 932). Her gait was within normal limits, but notes indicate she had difficulty completing activities of daily living, an abnormal posture, and radicular symptoms in her right leg to foot. (Tr. 932). She also had some abnormal ranges of motion and manual muscle testing. (Tr. 932–34). She was assessed as having decreased range of motion, decreased muscle strength in her upper and lower extremities, abnormal posture, muscle guarding or spasms, decreased self care, and decreased functional activities, but no gait deficits. (Tr. 935). Her rehab potential was listed as poor. (Tr. 935).

On March 26, 2010, Plaintiff saw Dr. Manohar for diabetic comprehensive care and her blood sugar was very high. (Tr. 954). She had no neurological deficit, her foot exam was normal, and her respiratory exam was also normal. (Tr. 954).

On April 7, 2010, Dr. George instructed Plaintiff to continue physical therapy. (Tr. 920). On April 21, 2010, Plaintiff told Dr. George she missed therapy due to illness. (Tr. 919).

12

On April 27, 2010, Plaintiff complained of abdominal pain, vomiting, and a migraine. (Tr. 949). Her blood tests showed elevated lipase levels and she was instructed to go to the ER. (Tr. 949). Tests showed Plaintiff had a contracted gallbladder containing gallstones. (Tr. 860, 909). Examination revealed Plaintiff's extremities were non-tender with a normal range of motion and she had no motor or sensory deficits. (Tr. 914). Plaintiff was diagnosed with mild pancreatitis and gallstones and told she would likely need her gallbladder removed. (Tr. 903). On May 2, 2010, Plaintiff requested to be discharged from physical therapy after two visits due to her impending gallbladder surgery and the therapist listed Plaintiff's response to therapy and prognosis as poor. (Tr. 931). On May 4, 2010, Plaintiff had her gallbladder removed. (Tr. 876–900). When she was discharged, Plaintiff was ambulating regularly and was restricted to light activity while she continued to heal. (Tr. 887).

On June 4, 2010, Dr. George noted Plaintiff had not gone to physical therapy and again encouraged her to start therapy. (Tr. 916).

Opinion Evidence

On July 18, 2008, consulting physician Dr. Leigh Thomas assessed Plaintiff's physical residual functional capacity (RFC). (Tr. 444–51). She believed she could frequently carry 25 pounds and occasionally carry 50 pounds. (Tr. 445). Dr. Thomas also found she could stand, walk, or sit for about six hours in an eight-hour workday and was unlimited in pushing and pulling. (Tr. 445).She noted the soft tissue mass in Plaintiff's shoulder, which was not limiting her; he also stated all Plaintiff's conditions were manageable with no damage to vital organs and noted Plaintiff wears splints at night for her wrist. (Tr. 445–46).

Dr. Thomas opined Plaintiff could never climb ladders, ropes, or scaffolds, but could

13

occasionally climb ramps and stairs, stoop, and crouch. (Tr. 446). She found Plaintiff had no manipulative, visual, or communicative limitations. (Tr. 447–48). Dr. Thomas also found Plaintiff should avoid all exposure to workplace hazards, should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and should avoid driving. (Tr. 448). Overall, Dr. Thomas found Plaintiff partially credible, stating the severity of her conditions "[wa]s far from disabling" and she noted several normal tests were inconsistent with her alleged severity. (Tr. 449).

On February 22, 2011, Dr. George wrote a letter explaining he was treating Plaintiff for multiple problems involving her spine and shoulder strains. (Tr. 967). He opined, "[D]ue to these conditions she is unable to work at this time and the prognosis is this is permanent." (Tr. 967).

Plaintiff's Reports to the Agency

Plaintiff's past work includes a position as a manager at a convenience store from 1997 to 2003. (Tr. 146). She has also done cleaning work through a temp agency. (Tr. 33, 146).

According to Plaintiff, COPD made it difficult for her to breathe while walking or doing simple activities and she had a chronic cough and constant congestion. (Tr. 145). She reported her diabetes caused high blood sugar and was difficult to maintain, and she stated her hepatitis C caused constant nausea, migraines, and fatigue. (Tr. 145). She also reported severe pain and locking in her joints. (Tr. 145). Plaintiff said her pain was a ten out of ten most days, making it difficult to do simple things and concentrate. (Tr. 145). Plaintiff also stated she stopped working in 2005 due to lack of work. (Tr. 145). Plaintiff reported taking many medications and supplements to manage her numerous conditions. (Tr. 149–50). Overall, Plaintiff described her symptoms as pain, fatigue, nausea, shortness of breath, dizziness, lack of concentration, and a constant ringing in her head. (Tr.

14

158). She explained she had excruciating pain in her legs and hands, migraines, constant dizziness and nausea, and constantly felt sickly. (Tr. 158). According to Plaintiff, any kind of activity made her symptoms worse and "[j]ust being alive hurt[]". (Tr. 158).

Plaintiff reported living in a house with her sister. (Tr. 166). She said a typical day consisted of taking medication and fighting off vomiting all day due to migraines and acid reflux. (Tr. 167). She reported limited functions due to difficulty breathing and problems with her joints and muscles, stating she watched a lot of television because of her limited functions. (Tr. 167). Plaintiff said she cared for pets with the help of her sister. (Tr. 167). Before her illness, Plaintiff said she could walk a mile each day, lift things heavier than five pounds, exercise, and play with her grandchildren. (Tr. 167). She indicated she had difficulty sleeping due to her conditions. (Tr. 167). Plaintiff said she has some difficulties with personal care, sometimes she could not stand due to pain, experienced difficulty bathing because hot water exacerbated her breathing condition, and sometimes dropped silverware. (Tr. 168). Plaintiff reported she could prepare frozen dinners, sandwiches, and simple meals and prepared at least one meal per day. (Tr. 168). Plaintiff also reported doing laundry about once a week but she stated she needed help carrying the clothes in baskets. (Tr. 169). She said she went outside multiple times daily, could go out alone, and could walk or ride in a car but did not have a current license. (Tr. 169). Plaintiff said she went grocery shopping approximately once a month, accompanied by someone else. (Tr. 169). Plaintiff enjoyed reading and watching television, and said she did these things every day when she did not have a headache, though she stated she could not read or watch television for as long as she used to due to concentration issues. (Tr. 170). Plaintiff reported her symptoms affected almost all her functional abilities. (Tr. 171). She stated she could not lift more than five pounds, could only walk a half block, could not think or concentrate

15

for more than ten minutes, and dropped things. (Tr. 171).

Plaintiff later reported her daily activities included taking medication, trying to exercise, trying to do as many household chores as possible, and sitting or laying around the rest of the day. (Tr. 201). She stated she no longer took care of pets. (Tr. 201). Her symptoms and difficulties were largely the same. (Tr. 201, 205). In addition, she reported she needed help with buttons and zippers, could not bathe without sitting, sometimes needed help washing and drying her hair, did not shave, and sometimes forgot to take care of personal hygiene needs. (Tr. 202). Plaintiff continued to say she could cook simple meals, do some laundry and household chores, and go outside multiple times a day. (Tr. 203). At that time, Plaintiff stated she wore splints for her arms. (Tr. 206). Plaintiff also complained of constant pain in her back and extremities, along with weakness and loss of feeling in her hands and arms. (Tr. 211–12).

ALJ Hearing

At the hearing on July 14, 2010, Plaintiff testified about her past work as the assistant manager of a beverage store and doing cleaning work for a temp agency. (Tr. 33). Regarding her past addictions, Plaintiff testified she was clean and sober with only one relapse on alcohol in 2007. (Tr. 36). The ALJ questioned Plaintiff about her good performance on a stress test in February 2008, and Plaintiff admitted she did well but stated she has good days and bad days. (Tr. 37). Plaintiff testified she had difficulty focusing, could not lift or sit for too long, lost her balance, and fell frequently. (Tr. 38). She explained she had a deteriorating disc in her lower back and shoulder difficulties, along with weak muscles and bad carpal tunnel syndrome on her right side. (Tr. 38). She said she wore hand and wrist splints at night and her hands went numb during the day. (Tr. 41). Plaintiff testified one of her medications made her dizzier than usual and she did not feel normal

16

when she took it. (Tr. 39). She also said her sciatic nerve sometimes acted up and her legs sometimes went out from under her. (Tr. 39). Plaintiff also testified about her history of gastrointestinal bleeding and stated she had hepatitis C but had never treated it. (Tr. 40, 42).

According to Plaintiff, the pain in her back and shoulders was the worst. (Tr. 42). She said injections helped for a day or two. (Tr. 42–43). Plaintiff testified sitting and walking caused pain and numbness, explaining she thought she could sit for fifteen minutes before needing to change positions. (Tr. 43). She also thought she could stand for only five or ten minutes without needing to change positions, and could walk for only about five minutes. (Tr. 43). Plaintiff further testified she could only lift about five pounds, reporting problems with losing her grip, dropping items, her hands locking, and an occasional inability to close her hands. (Tr. 44). She stated she had difficulty sleeping and described difficulties maintaining her diabetes. (Tr. 45–48). Plaintiff testified she planned on seeing an orthopedic surgeon regarding her carpal tunnel syndrome. (Tr. 47). She also stated she only wore glasses when she had to read despite the fact that she was "supposed to wear them all the time". (Tr. 48). Plaintiff told the ALJ she had neuropathy in her legs causing pain and numbness, along with sharp pains in her toes and feet. (Tr. 49).

The ALJ then asked the VE to consider a person with the RFC as described in Dr. Thomas's RFC assessment[2] (Tr. 444–51) – specifically mentioning the medium exertional level – and the VE testified such a person could perform Plaintiff's past relevant work as an assistant manager at a

---

2. Dr. Thomas found Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; sit, walk, or stand for six hours in an eight hour workday; push or pull without limitation; occasionally climb ramps and stairs, stoop, or crouch; never climb ladders, ropes, or scaffolds; had no manipulative, visual, or communicative limitations; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and must avoid all exposure to hazards such as machinery, heights, and driving. (Tr. 445–48).

convenience store and as a janitor. (Tr. 53–54). The ALJ's next hypothetical reduced the exertional level to sedentary and added a number of additional limitations including the following: a sit-stand option; limitations on Plaintiff's ability to push and pull; avoiding concentrated exposure to fumes, odors, dust, gases, and poor ventilation; avoiding all hazards such as machinery, heights, and driving; occasionally climbing ramps and stairs but never ladders, ropes, or scaffolds; and occasional stooping and crouching. (Tr. 54–55). The VE testified such a person could work as a front desk receptionist or an order clerk, each of which accounted for significant numbers of jobs in the national economy. (Tr. 55–56). The VE's answer did not change when the ALJ added mental limitations to the RFC. (Tr. 56–58).

In his closing statement, Plaintiff's attorney stated he thought Plaintiff would be disabled under the Medical-Vocational Guidelines (the grid) with the limitations in the ALJ's second hypothetical limiting her to sedentary work with additional limitations and further argued the evidence shows Plaintiff is limited to sedentary work. (Tr. 59–60).

ALJ Decision

The ALJ determined Plaintiff's date last insured was March 31, 2009 and further found she did not engage in substantial gainful activity between her alleged onset date and date last insured. (Tr. 15). The ALJ determined Plaintiff suffered from a number of impairments, which in combination were severe, including bipolar disorder with depression, COPD, chronic back pain secondary to a history of a compression fracture at L-4 and history of back strain, diabetes mellitus, hepatitis C, and carpal tunnel syndrome, but found these impairments did not meet or medically equal a listing. (Tr. 15). After considering the entire record, the ALJ found Plaintiff retained the RFC to perform less than a full range of medium work. (Tr. 16). Specifically, he found she could "lift

18

and/or carry 50 pounds occasionally and 25 pounds frequently; she [wa]s able to stand and/or walk for 6 hours in an 8 hour day and sit f or 6 hours in an 8 hour day; [and she could] push and pull without limitations" but assigned a number of mental restrictions not at issue here. (Tr. 16–17).

In reaching his RFC determination, the ALJ considered Plaintiff's allegations that she was in constant severe pain, "[j]ust being alive hurt[]", and she could barely lift, stand, walk, sit, climb stairs, kneel, squat, reach, use her hands, see, hear, talk, or bend. (Tr. 17). However, he found her statements concerning the intensity, persistence, and limiting effects of these symptoms not credible because "they [we]re inconsistent with her diagnostic test results, clinical signs[,] and activities of daily living" and further found Plaintiff's credibility was undermined due to her poor work history and other factors. (Tr. 17). The ALJ noted Plaintiff's medical noncompliance, stating it was inconsistent with allegations that her impairments were of disabling severity. (Tr. 18). He also noted a number of episodes relating to drugs, implicating Plaintiff's less-than-forthcoming statements regarding drug and alcohol use. (Tr. 18). Additionally, the ALJ found Plaintiff's overall treatment history – consisting of minimal physical therapy and no back or carpal tunnel surgery – too conservative to support her alleged symptom severity. (Tr. 18). The ALJ also noted a number of physical examinations and tests showing normal results (Tr. 18) and noted Plaintiff's activities of daily living – caring for dogs, grocery shopping, laundry, cooking simple meals, and no difficulty sitting and watching television for hours at a time – were inconsistent with the alleged severity of her symptoms. (Tr. 19).

The ALJ found Plaintiff could not perform any past relevant work, was an individual closely approaching advanced age on her date last insured, and had a high school education. (Tr. 19–20). He found the grid, used as a framework, supported finding Plaintiff not disabled regardless of

19

whether she had transferable job skills. (Tr. 20). The ALJ then stated the VE testified a person with Plaintiff's age, education, work experience, and RFC could perform the jobs of front desk receptionist and order clerk. (Tr. 20). Because he found Plaintiff could make a successful adjustment to other work existing in significant numbers in the national economy, he found her not disabled. (Tr. 21). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

   1. Was the claimant engaged in a substantial gainful activity?

   2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

   3. Does the severe impairment meet one of the listed impairments?

   4. What is claimant's residual functional capacity and can she perform past relevant work?

   5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred by finding Plaintiff retained the RFC to perform the physical requirements of a full range of medium work. (Doc. 14, at 1). Specifically, Plaintiff argues

21

substantial evidence does not support this finding because (1) although the ALJ gave significant weight to the state agency medical consultant assessments, the ALJ's RFC determination failed to include postural restrictions those assessments placed on Plaintiff; (2) alternatively, the ALJ should not have given significant weight to the medical consultants because their opinions were not consistent with objective evidence; and (3) the ALJ ignored evidence of limitations imposed by carpal tunnel syndrome, back pain, and diabetes. (Doc. 14, at 15–18).

<u>Decision Not to Include Postural Limitations</u>

The ALJ found Plaintiff could perform medium work with some mental limitations not at issue in this appeal. (Tr. 16–17). In reaching this conclusion, the ALJ cited a number of reasons for finding Plaintiff's complaints and statements about her symptoms not credible, focusing primarily on Plaintiff's apparent dishonesty with regard to medication compliance, recreational drug use, and alcohol use. (Tr. 18). Additionally, the ALJ emphasized Plaintiff's conservative treatment history and noted some of Plaintiff's conditions were well-controlled with medication. (Tr. 18). The ALJ also relied on a number of normal physical examinations and test results, including examinations showing Plaintiff had no difficulty walking. (Tr. 18). Further, the ALJ found her activities of daily living inconsistent with her alleged symptom severity. (Tr. 19).

The ALJ gave "significant weight" to the physical consultative assessments because he found them consistent with objective medical evidence and the record as a whole. (Tr. 19). Dr. Leigh was the relevant physical consultant and found Plaintiff could frequently carry 25 pounds; occasionally carry 50 pounds; stand, walk, or sit for about six hours in an eight-hour workday; and was unlimited in pushing and pulling; but could never climb ladders, ropes, or scaffolds; could only occasionally climb ramps and stairs, stoop, and crouch; should avoid all exposure to hazards such as machinery

heights; avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and avoid driving. (Tr. 445–46, 448). At the hearing, the ALJ asked the VE to consider this opinion, specifically with regard to medium work, and the VE testified such a person could still perform Plaintiff's past relevant work. (Tr. 54).

Despite finding Plaintiff could perform medium work, the ALJ's opinion stated Plaintiff could not perform her past relevant work even though the VE clearly testified she could. (Tr. 19). He went on to misstate the VE's testimony, saying the VE testified a person with Plaintiff's RFC – medium work, as determined by the ALJ – could perform the representative occupations of front desk receptionist and order clerk. (Tr. 20). The VE actually testified a person limited to sedentary work with numerous postural limitations – including those Dr. Leigh assessed – could perform these jobs. (Tr. 54–55). However, despite these issues, substantial evidence supports the ALJ's conclusion that Plaintiff can perform a full range of medium work, and VE testimony established she could perform work – namely, her past work. Moreover, the VE testified a person who could perform *sedentary* work with all Dr. Leigh's postural limitations could perform jobs existing in the national economy. The ALJ's failure to include those limitations in Plaintiff's RFC was not error, and even including them would not change the ultimate determination that Plaintiff was not disabled.

*Substantial Evidence Supports Plaintiff Performing Medium Work*

Between Plaintiff's alleged onset date and date last insured, she almost always had normal extremities with a full range of motion (Tr. 251, 258, 321, 350, 619, 630, 641, 661), normal motor strength and intact sensation (Tr. 263, 489, 493, 630, 641, 661), normal reflexes (Tr. 489, 493, 630, 641, 661), normal neurological exams – including no weakness or numbness (Tr. 327, 358, 433, 618, 629, 651), and no gait problems or difficulty ambulating (Tr. 239, 256, 327, 358, 433, 489, 493,

629). She did occasionally exhibit a restricted range of motion in her back (Tr. 493, 630, 641, 661), but this is dwarfed by other evidence showing no strength, reflex, sensation, or ambulation problems. Though Plaintiff occasionally complained of issues with numbness, pain, and weakness in her hands and exhibited positive Tinel's and Phalen's signs (Tr. 416, 493), her treatment for this was conservative, consisting only of wearing wrist splints at night (Tr. 41, 416).

Dr. George's treatment notes after Plaintiff's date last insured did document range of motion, strength, and carpal tunnel syndrome issues (Tr. 805–08, 810–11, 813, 915–16, 918, 921–27), but to qualify for DIB, Plaintiff must have been under a disability as of the date her insured status expired on December 31, 2008. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Furthermore, other medical evidence during the time Dr. George treated Plaintiff continued to show relatively normal results. X-rays of her shoulders were normal and MRIs of her shoulders showed only minimal supraspinatus tendinosis. (Tr. 859, 945). To treat Plaintiff's shoulder pain, Dr. George recommended stretches, physical therapy, and injections, but Plaintiff never completed physical therapy. (Tr. 807–08, 810–11, 916, 920, 931). Neurologist Dr. Winer noted Plaintiff might benefit from carpal tunnel release surgery, but Dr. George never referred Plaintiff for the surgery even though she continued to see him for months after Dr. Winer's consultation. (Tr. 936; *see* Tr. 805, 916, 920). When she went to the ER on September 2, 2009, Plaintiff's back was non-tender with a painless range of motion, she could move all her extremities, and she was independent in activities of daily living. (Tr. 771). When she went to the ER on December 8, 2009, examinations of Plaintiff's respiratory system, back, extremities, and neurological system were normal, including no motor or sensory deficit and a full non-tender range of motion in her extremities. (Tr. 841). Plaintiff also had no motor, sensory, or

reflex deficit and her extremities had a normal, non-tender range of motion when she went to the ER on February 6, 2010. (Tr. 819, 826). And when Plaintiff was discharged following her gallbladder surgery, she was ambulating regularly. (Tr. 887).

All in all, numerous normal objective medical findings – even after her date last insured – provide substantial evidence for the ALJ's conclusion that Plaintiff can perform medium work. Indeed, the medical evidence showed little if any evidence her strength was limited. Further, her relatively conservative treatment for carpal tunnel syndrome and back and shoulder pain – consisting only of wrist splints, medication, and therapy she did not attend, but not including any surgeries – shows she was not as limited as she alleged. Moreover, the ALJ correctly noted Plaintiff's daily activities showed she could do more than she alleged; grocery shopping, laundry, cooking simple meals, and sitting and watching television for hours are inconsistent with Plaintiff's allegations that she could not even sit for fifteen minutes without needing to change positions and could only walk for five minutes.

With respect to the postural limitations in Dr. Leigh's assessment, which Plaintiff argues the ALJ should have included in the RFC, the Court finds it was not error to fail to include them. Plaintiff argues the ALJ inexplicably did not include the limitations after giving Dr. Leigh's opinion significant weight. (Doc. 14, at 15). But an ALJ is only required to include limitations he finds credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Here, his failure to include postural limitations was not inexplicable because the objective evidence detailed above did not amount to substantial evidence showing limitations on Plaintiff's ability to climb, stoop, crouch, or work around hazards. With regard to Dr. Leigh's limitation on Plaintiff's ability to work around fumes, odors, dusts, gases, and poor ventilation – presumably related to her COPD

– Plaintiff's treatment history for COPD showed she was not as limited as she alleged. She consistently continued to smoke despite her COPD, consistently declined the assistance of a smoking cessation program, and even went outside without hospital staff permission so she could smoke while hospitalized for COPD exacerbation, something the treatment notes stated caused her no complaints, complications, or distress. (Tr. 241, 256, 355–56, 421, 545).[3] The ALJ gave Dr. Leigh's opinion significant, not controlling weight, and substantial evidence supports his decision not to include those postural limitations in Plaintiff's RFC.

*Harmless Error*

Even if the ALJ *had* erred by failing to include Dr. Leigh's postural limitations, this would be a harmless error at most. The ALJ asked the VE whether a person limited to medium work could perform Plaintiff's past relevant work, and the VE testified affirmatively. Though in his decision the ALJ stated Plaintiff could not perform her past relevant work, VE testimony established that a person who could perform medium work *could* perform Plaintiff's past work. And even if a person was limited to sedentary work (an extremely limited exertional level wholly unsupported by Plaintiff's medical record), the VE testified that person could still perform some jobs. There is thus no reason to believe the ALJ's disability determination would be any different on remand and "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzalez*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)). Mindful that courts are not required to "convert judicial review of agency action into

_____

3. Further, though they were after her date last insured, multiple medical records detailed normal respiratory exams. (Tr. 841, 954–55).

a ping-pong game" where "remand would be an idle and useless formality", *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (quoting *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969)), the Court finds such would be the case if it remanded here. Substantial evidence supports the ALJ's RFC determination and with or without the postural limitations assessed by Dr. Leigh, Plaintiff could perform jobs existing in significant numbers in the national economy. Thus, substantial evidence supports the ALJ's conclusion that she was not disabled.

Back Problems and Diabetes

Plaintiff argues the ALJ failed to address a number of objective tests indicating back problems, including the MRI showing an old compression fracture at L4 with associated disc degeneration. (Doc. 14, at 17); (Tr. 457). Plaintiff also argues the ALJ ignored the EMG revealing probable polyneuritis secondary to diabetes mellitus and bilateral lumbar radiculitis, further arguing the ALJ fully ignored Dr. George's treatment notes detailing severe lumbar impairments. (Doc. 14, at 17); (Tr. 938, 804–13, 915–30). However, the ALJ adequately addressed Plaintiff's back pain and diabetes, and substantial evidence supports the ALJ's conclusions with regard to these issues.

The ALJ summarized Plaintiff's medical records, including evidence of her old compression fracture at L4, and substantial evidence supports his conclusion to find Plaintiff's back pain not disabling. (Tr. 18–19). Despite Dr. George's treatment records – all of which post-date Plaintiff's date last insured – the record as already detailed shows Plaintiff consistently failed to show neurological, motor, or sensation deficits, almost always had a normal gait pattern and range of motion, did not attend physical therapy, and did not require surgery to treat her condition. (*See also* Tr. 490). Dr. George consistently had to urge Plaintiff to attend physical therapy, and records from treatment providers other than Dr. George during the time he treated Plaintiff show Plaintiff had

27

non-tender extremities with normal ranges of motion, a gait within normal limits, only some diminished strength, and no motor, sensory, or reflex deficit.

With regard to Plaintiff's argument that the ALJ did not account for limitations arising from her diabetes in his RFC assessment, Plaintiff frequently failed to control her condition or follow up with physicians regarding it and records also indicated it at least somewhat improved when she complied with treatment. (Tr. 348–49, 355–56, 412–14, 421, 489). Further, the EMG revealing probable polyneuritis secondary to diabetes mellitus was performed after Plaintiff's date last insured. (Tr. 936). Thus, substantial evidence supports the ALJ's conclusions that while Plaintiff's back pain and diabetes were severe in combination with her other impairments, they were not disabling.

Carpal Tunnel Syndrome

Though the ALJ found Plaintiff suffered from carpal tunnel syndrome, he did not find it was a severe impairment on its own; rather, he listed it among a number of other impairments which were severe in combination. (Tr. 15). Though it is true the ALJ did not specifically mention all the medical evidence relating to Plaintiff's carpal tunnel syndrome, he correctly noted her treatment for the condition had been minimal. (Tr. 18). Indeed, the only treatment Plaintiff ever used for her carpal tunnel syndrome was wearing wrist braces at night, and most of the complaints regarding this condition were after her date last insured. Though in January 2010 (again, after Plaintiff's date last insured) Dr. Winer noted Plaintiff could benefit from surgical carpal tunnel release, he left the decision up to Dr. George and despite Dr. George's medical records continuing through June 4, 2010, he never referred Plaintiff for the surgery. In combination with the other evidence and considering the ALJ's numerous reasons for finding Plaintiff's complaints not credible, substantial

28

evidence supports the ALJ's decision not to include limitations related to carpal tunnel syndrome in the RFC determination.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

_____s/James R. Knepp, II_____
United States Magistrate Judge
